POWDER POWER TOOL CORPORATION, Plaintiff,

v.

POWDER ACTUATED TOOL COMPANY, Inc. and Frank J. Klunk, Defendants.

Civ. No. 53 C 1886.

United States District Court, N. D. Illinois, E. D.

Jan. 27, 1955.

---

Wilkinson, Huxley, Byron & Hume, Chicago, Ill., for plaintiff.

Sheridan, Davis & Cargill and Warren C. Horton, Chicago, Ill., for defendants.

IGOE, District Judge.

1. Plaintiff, Powder Power Tool Corporation, is a corporation organized under the laws of Oregon, and has an office and place of business in Portland, Oregon. Plaintiff is engaged in the business of manufacturing and selling explosively operated tools and studs to be used therewith. Defendant Powder Actuated Tool Company, Inc., is a corporation organized under the laws of the State of Illinois and has an office and place of business in Chicago, Illinois. It was organized on March 10, 1950, for the purpose of engaging in the business of distributing plaintiff's explosively operated tools and studs in the State of Illinois, including the Chicago area. Its name was selected with the approval of plaintiff and as one which was appropriate to designate a company associated with plaintiff in the capacity of a distributor. Defendant Frank J. Klunk is a resident of Chicago, Illinois. He is President of the defendant corporation and has been since its organization. The stock of the defendant corporation as organized was held 49% by defendant Klunk, 49% by one James C. Laulis, and 2% by the defendant Klunk's son, Francis G. Klunk. In May of 1950, Laulis withdrew from the defendant corporation and since that time the stock in defendant corporation has been held 49% by defendant Klunk, 49% by his son, Francis G. Klunk, and 2% by defendant Klunk's wife. At no time has defendant Klunk's wife taken any active part in the management or the affairs of defendant corporation. Defendant Klunk's son was actively engaged with his father in the management and the affairs of defendant corporation for a period of approximately one year extending from its organization in March of 1950, but at all times defendant Klunk had ultimate and final authority and control over the management and affairs of the corporation.

2. Plaintiff owns Letters Patent No. 2,637,241, issued on May 5, 1953, for an improved "Stud for Explosive Installations". This patent was issued on the joint invention of Charles R. Webber and Virginius R. Erickson, and was assigned to the plaintiff company before its issuance and plaintiff appears as the owner on its face. This action was instituted September 9, 1953 against the defendant company and the defendant Klunk individually, charging infringement of plaintiff's patent No. 2,637,241

and also charging defendants with acts of unfair competition. By it the plaintiff seeks injunctive relief and damages on both counts and prays that the damages be trebled. There is no contest as to the plaintiff's title to patent No. 2,637,-241.

3. The invention covered by patent No. 2,637,241 relates to improved studs of a construction adapted to be projected from explosively operated tools by the explosive force of a blank cartridge and to be driven thereby in steel, concrete, or other hard surfaces, and more particularly to improved studs of that type which overcome certain disadvantages inherent in studs of the prior art. A further object of the invention is to provide studs of this type which facilitate controlling the effective power or force applied to the stud from a standard explosive charge. As stated in the patent, the studs of the invention are provided on their shanks with a frictional portion or element, preferably of a destructible material, to hold the stud at a selected position along the barrel of the tool so that the desired effective force from a standard explosive charge will be applied to the stud. At the same time, the frictional element, being of a removable or destructible character, is readily destroyed so that it is no longer a part of the stud at the time it is installed in the wall surface. With respect to the frictional portion or element of destructible material, the patent states that it not only serves as a frictional retainer for the stud but also serves initially as a seal against which the explosive gases impinge upon trying to pass between the threaded portion of the stud and the barrel. The patent contains two claims, both of which are in issue. Claim 2 is typical of both and reads as follows:

"2. A stud for insertion into the surface of a work piece by its ejection through the bore of an explosively actuated driven tool; said stud comprising a body having a cylindrical head at one end and a surface penetrating shank at its other end, the head providing a shoulder to limit the penetration of the shank, and a deformable resilient frictional retainer on said shank and extending outwardly of and substantially around the perimeter of the shank, whereby said retainer when the stud is inserted in the bore of said explosively actuated tool will be deformed to frictionally retain said stud in any selected position along the bore and having a sealing effect on the explosive charge used to eject the stud."

4. The art of explosively operated tools for driving studs or fasteners into steel and similar hard surfaces originated as early as 1919, as evidenced by Patent No. 1,365,870, issued to Robert Temple of England, on an application filed December 15, 1919. Subsequent efforts to develop this art are evidenced by Patent No. 1,388,363, issued to John A. Miller on August 23, 1921, Patent No. 2,050,047 issued to Harold H. Febrey on August 4, 1936, and Patent No. 2,-470,117 issued to Stanley A. Temple on May 17, 1949. The earlier devices were crude, bulky, and dangerous and remained more of a technical curiosity than a practical device. The subsequent efforts of Stanley A. Temple resulted in the production of a hand tool manufactured during the second World War by the Iron Fireman Company of Cleveland, Ohio, and supplied to the United States Navy and to the Russian Government under the Lend-Lease Program.

5. Prior to the invention in suit, the tool and stud constructed of the Stanley Temple Patent No. 2,470,117 represented the best and most practical development in the form of a hand tool existing in the art. However, it was unsatisfactory in a number of respects and did not represent a solution of the problems inherent in the art such as would permit its widespread adoption and commercial use in the civilian, construction, and industrial fields. With the exception of the Stanley Temple stud, all of the tools existing in the art prior to the invention in suit required

the use of studs having one or more of the following disadvantages:

(a) Breach-loading, which was dangerous;

(b) The inability to shoot in a downward direction when the cartridge and stud were supplied and loaded separately; or

(c) Employment of live ammunition, which is extremely dangerous if the cartridge and stud were supplied and loaded as a pre-attached unit.

In addition, with all prior devices power control was possible only through the use of a plurality of different cartridges having power loads of different fire intensity. The studs employed in the construction illustrated in the Temple patent No. 2,470,117 suffered the disadvantage of having a metal flange capable of being sheared from the stud during the firing operation and formed integrally with the head of the stud. Its use involved the disadvantages of high cost of manufacture, damage to the heads of the studs, particularly when threaded, resulting from the shearing of the flange and subsequent corrosion and also extreme danger to the operator whenever, through inadvertence, the ring sheared during one operation was not removed before the next firing operation.

6. At the close of World War II, the Iron Fireman Company of Cleveland discontinued the manufacture of explosive tools and studs of the Stanley Temple type and, as a result, no source of supply of such tools existed in this country at that time. Plaintiff's predecessor, Meco Co., of Portland, Oregon, was organized to take over the explosive tool business of the Iron Fireman Company, which had been discontinued, with the purpose in mind of supplying a hand tool for general civilian use. Plaintiff company was organized in January of 1947 for the same purpose and as the successor to the explosive tool business then being started by the Meco Co. For a period of approximately three years, the plaintiff made explosive tools and studs of the Stanley Temple type and sold them for general civilian use in the construction and industrial fields. Due to the disadvantages inherent in this construction, particularly the high cost of the flange studs, the damage thereto resulting from shearing the flange, and the inherent danger involved in its use, the tool was not widely accepted. Plaintiff therefore undertook, through research, to develop an improved tool and stud construction which not only would eliminate the disadvantages inherent in the prior art constructions, but, in addition, would permit satisfactory use with relatively cheap .22 caliber cartridges and at the same time provide a satisfactory power control through the use of a cartridge of single power intensity. Due to the fact that the .22 caliber cartridges are smaller than standard ¼ inch studs, found to be a necessary size in use, a problem was presented by their use, not found in the firearms industry, namely, that of having a projectile larger than the cartridge that fires it.

7. As a result of research and experimentation, the inventors, Charles R. Webber and Virginius R. Erickson, jointly invented the stud covered by the patent in suit and provided thereby a simple, efficient, and inexpensive solution to the problem of the prior art, and at the same time a stud capable of being used with .22 caliber cartridges as well as one, the use of which would effect accurate and improved power control with the use of the cartridge of single fire intensity. The stud of the invention comprises four elements in combination, namely: a head at one end of the body of the stud; a penetrating shank of reduced diameter on the other end of the stud; a shoulder between the head and shank of the stud; and a deformable, resilient, frictional retainer on the shank extending outwardly to and around, or substantially around, the perimeter of the shank. The frictional retainer is characterized as being capable of being deformed to frictionally retain the stud in any selected position along the bore of the tool when inserted therein and capable of acting as a seal

or having a sealing effect for the explosive charge used to inject the stud. The advantages of the stud of the invention in suit are as follows: The stud is held in the bore of the tool frictionally, thus eliminating the shoulder in the tool and a flange on the stud, as required by the Stanley Temple construction; the plastic retainer is ejected from the tool with the stud and is removable and destructible so as to offer no interference with the normal functioning of the stud when penetrating the work; the stud is frictionally held in any selected position in the bore and is easily inserted through the breach opening to provide a gas chamber between the stud and the cartridge to provide an improved power tool with the cartridge of single intensity; the retainer serves to hold the shank of the stud in accurate alignment with the axis of the bore of the tool which is of great importance, due to the relatively loose fit between the studs and the bore; the retainer on the stud acts as a seal or barrier for that portion of the explosive gases which pass around the head of the stud and thus the retainer is caused to move forwardly on the stud and to become completely removed therefrom; the construction permits utilization of separate cartridges and studs and avoids the necessity of employing live ammunition or holding flanges of the Stanley Temple type; allows utilization of cartridges smaller than the studs, enabling the user to enjoy the benefits of the economy of .22 caliber cartridges; avoids the dangers of muzzle loading; avoids the damage to the threads of the heads of the studs inherent in the use of the flange studs of the Stanley Temple type; avoids the dangers inherent in the use of the Stanley Temple flanged stud through the failure to remove the sheared ring after each loading; and provides more accurate power control with utilization of cartridges of single power intensity and thus eliminates the need to stock and use a multiplicity of cartridges of different fire power.

8. The patents and publications cited by defendants and introduced in evidence, considered singly and collectively, fail to teach the invention taught and claimed in the Webber and Erickson patent No. 2,637,241. The best prior art references were cited by the Patent Office during the prosecution of the application resulting in said patent.

9. Upon the completion of the invention in suit, plaintiff adopted a new and improved stud for .22 caliber tools and placed the same on the market early in January of 1950. Immediately its sales of tools and studs were increased and in the course of a period of approximately one year the stud sales multiplied in the neighborhood of 350%. The invention was immediately recognized as a solution to the existing problems in the art and has been widely accepted and used by the public. In addition, since the commercial sales of the invention were started by the plaintiff, approximately 75% of the industry has also adopted the features of the invention.

10. Since early in the fall of 1950, defendants have manufactured and sold studs which embody the four elements of the claims, including the plastic retainer on the shank of the stud adapted to frictionally hold the stud in any selected position in the bore of the tool and of acting as a seal or having a sealing effect for the explosive gases. The defendants' retainer differs slightly from the retainer shown in the patent in that the peripheral portions are cut away over small areas to provide four projecting frictional holding ears, but when inserted in the barrel in the bore of the tool, approximately the outer half of the space so provided is eliminated by the bending of the ears when in the inserted position. The slight space thus provided does not alter the essential functions of the retainer as an element of the combination, as it continues to act as a frictional retainer for the stud in the selected position in the bore, and also as a seal or as a retainer having a sealing effect for the explosive gases. In use, the retainer is forced off of the shank of the stud to remove or destroy the same in the same manner contemplated for the retainer of the in-

vention in suit. The defendants' stud in use accomplishes substantially the same result in substantially the same manner by employing substantially the same means as the stud defined in the claims of the patent.

11. In February of 1950, defendant Klunk asked the plaintiff for authorization to serve as plaintiff's distributor in Illinois in the Chicago area. Permission was granted to serve in that capacity on an interim or trial basis. The defendant corporation was organized for that purpose and defendants proceeded to buy and sell the tools and studs of the plaintiff. Prior to the time the defendant corporation was organized, defendant Klunk was told that plaintiff's tools were sold in the general contracting field, in the Chicago area, by the Thomas Hoist Company, and the defendant corporation entered upon the distributorship relationship with the understanding that it was not to sell to Thomas Hoist's customers, nor was Thomas Hoist to sell outside of its own field. Thomas Hoist made it a practice to give to its own customers in the general contracting field quantity discounts, which fact was made known to the defendant corporation at least as early as March 21, 1950. Around the middle of April, 1950, defendant Klunk visited plaintiff's plant in Portland, Oregon, and while there inspected the procedures employed by the plaintiff in manufacturing its studs. Defendant Klunk asked questions in regard to the manufacturing techniques and acquired information with respect thereto. In the first part of June 1950, defendant Klunk notified the plaintiff that he wanted to discontinue the distributorship representation of the plaintiff. The plaintiff acceded to defendant Klunk's request and said that arrangements would be made for a successor to take over its business. During the months of March, April, May and June of 1950, during which defendant company acted as the plaintiff's distributor, approximately $16,000 worth of tools and studs had been purchased by the defendant company from plaintiff. As an incident to the termination of its distributorship, defendants desired to have the plaintiff purchase from them inventory on hand valued at $3,063.73, and the plaintiff was desirous of having defendant company pay a balance due on its account in the amount of $1,076.52.

12. During the period from March through June of 1950, when defendant company was acting as plaintiff's distributor, it removed warranty cards from the tool packages and failed to have such cards filled out with the names and addresses of the tool purchasers and returned to the plaintiff, and in this way defendants deprived the plaintiff of all knowledge with respect to the customers to whom defendants had sold plaintiff's tools. Around the middle of July, 1950, an agreement was reached between the plaintiff and the defendant company on the following points: Plaintiff would buy the inventory from the defendant company and the defendant company would pay the balance due on its account to the plaintiff, and as a condition to this transaction, defendants would turn over to plaintiff a full list of the customers to whom defendant company had sold plaintiff's tools and studs. Upon concluding this agreement, the inventory was delivered to and taken over by the plaintiff and a check in proper amount, namely, $1,987.21, was delivered by plaintiff to defendant company. It was further agreed that the defendant company thereafter should have the exclusive right as a dealer to sell to the governments of the State of Illinois and the City of Chicago, and as an incident thereto, it was understood that the defendant company would not engage in a competing business in the sale of explosively operated tools and studs. After concluding the agreement, defendants delivered the names of twenty-four customers to plaintiff's representatives and asked permission to withhold the balance until such time as they were able to collect money allegedly due and owing them from such customers. The check was delivered to defendant Klunk upon defendants' promising that the remaining names of customers would be turned over

to the plaintiff as soon as possible, which was estimated to be a period in the neighborhood of six weeks. Following the delivery of the check, plaintiff's representatives made several requests to receive the withheld names of customers, but in all instances delivery thereof was refused.

13. Early in June, 1950, defendants undertook to acquire a supply of studs of its own. The studs here complained of were manufactured and supplied to them in the late summer or early fall of 1950 and they were placed on the market by the defendants in the early fall of 1950. When the defendant company embarked upon the sale of its own studs it did so without changing its company name and without advising its customers that the defendant company was no longer acting as the plaintiff's distributor. Furthermore, it continued to sell to customers whose names had been withheld from the plaintiff, and the sales so made resulted in the defendant company "palming off" its studs as and for the studs of the plaintiff.

14. Defendant company and defendant Klunk, for all practical purposes, are one and the same, and the tortious acts committed by defendants were the deliberate and willful acts of defendant Klunk. Defendant company, after terminating its distributorship, had no business or purpose other than that of carrying out the infringing and unfair practices, all of which were under the personal control and authorization of defendant Klunk. Accordingly, defendant company was a mere shell maintained solely for the purpose of protecting defendant Klunk from possible liability for the tortious acts committed.

## Conclusions of Law.

1. The Court has jurisdiction of the subject matter of the action and of the parties to the action.

2. The Webber and Erickson patent No. 2,637,241 discloses and claims patentable invention. Claims 1 and 2 thereof are not anticipated and are valid in law.

3. Claims 1 and 2 of the Webber and Erickson patent No. 2,637,241 are not restricted to studs having retainers of a particular shape. They extend to all studs having retainers which function to frictionally hold the stud in the bore of the tool and which have a sealing action or exert a sealing effect with respect to the explosive gases, so that the retainer is propelled thereby and forced off of the shank of the stud during the flight of the stud through the bore of the tool. Since the studs sold by defendants act in substantially the same manner and give substantially the same result, defendants' studs fall within the intent and meaning of the claims of said Webber and Erickson patent No. 2,637,241.

4. Ever since early fall, 1950, defendants have made, used, and sold the accused devices which infringe claims 1 and 2 of the Webber and Erickson patent No. 2,637,241. Such infringement has been willful and deliberate.

5. Defendant company has violated its contract with plaintiff in refusing to deliver the withheld lists of customers as promised, and has wrongfully sold its studs to customers rightfully belonging to plaintiff. Defendants have "palmed off" their studs and sold them as and for the studs of plaintiff to plaintiff's detriment and injury. Defendants have been guilty of unfair competition in so doing.

6. Defendant Klunk is personally liable along with defendant company for the acts complained of.

7. Plaintiff is entitled to a permanent injunction against defendants, Powder Actuated Tool Company, Inc. and Frank J. Klunk, and each of them, enjoining further infringement of each of the claims of the Webber and Erickson Patent No. 2,637,241, and also enjoining further acts of unfair competition with plaintiff, including the solicitation of customers from said customer lists, the "palming off" of defendants' studs as and for those of plaintiff, and the use of the trade-name Powder Actuated Tool Company, Inc. or any other name which is

confusingly similar to plaintiff's corporate name.

8. There shall be a judgment in the usual form adjudicating the Webber and Erickson Patent No. 2,637,241, and each of the claims thereof, to be valid and infringed by each of said defendants; enjoining each of said defendants as above provided; ordering an accounting for damages sustained by plaintiff as a result of past infringement and past acts of unfair competition; and awarding treble damages and costs to plaintiff, including reasonable attorneys' fees.